IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 17-cv-00629-RBJ

STEVEN R.F., a minor, by and through his mother, CARRIE FERNANDEZ,

     Plaintiff,

v.

HARRISON SCHOOL DISTRICT NO. 2, and various of its elected and appointed
representatives in their official capacities,

     Defendant.

---

## ORDER

This matter is before the Court on review of the Colorado Office of Administrative
Courts' ("COAC") findings and decisions in favor of defendant Harrison School District No. 2
("the District") on the grounds that the District had provided plaintiff Steven R.F. with a free
appropriate public education. Steven, by and through his mother Carrie Fernandez, seeks
reversal of the COAC's decision. For the reasons stated herein, the Court REVERSES the
COAC's decision.

## I. BACKGROUND

This is a dispute about whether the District violated the Individuals with Disabilities
Education Act ("IDEA") by failing to provide Steven with a free appropriate public education.
Steven is an autistic child who lives in the District. Steven has been attending the Alpine Center
("Alpine"), a private out-of-district treatment and education center for individuals with autism,
since 2013. This case arose from the District's decision in 2016 to move Steven out of Alpine.

**A. <u>The Individuals with Disabilities Education Act</u>.**

Before summarizing the factual background of Steven's case, it is helpful to provide a brief overview of the IDEA's relevant provisions. The purpose of the IDEA is "to ensure that all children with disabilities have available to them a free appropriate public education that emphasizes special education and related services designed to meet their unique needs and prepare them for future education, employment, and independent living. 20 U.S.C. § 1400(d)(1)(A). To receive federal funding under the IDEA, states must ensure all eligible students receive a free appropriate public education, or "FAPE." *Id.* § 1412(a)(1).

A particular child's FAPE must be tailored to his or her unique needs, so the Act mandates that each child have an individualized education program, or "IEP." *Id.* § 1401(14). The IEP is a written document providing the child's present levels of educational performance, his annual goals, the method by which the child's progress toward his goals will be measured, and a description of specific education and related services to be provided to the child. *Id.* § 1414(d)(1)(A)(i). The IEP must also include the projected date for the beginning of the services, "and the anticipated frequency, location, and duration" of those services. *Id.* § 1414(d)(1)(A)(i)(VII). A child's IEP is prepared at a meeting between a representative of the local educational agency, the child's teacher and parents, and, where appropriate, the child. *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cty. v. Rowley*, 458 U.S. 176, 181–82 (1982). A child's IEP must be reviewed and revised at least annually. 20 U.S.C. § 1414(d)(4)(A).

The Supreme Court has established a two-pronged test to determine whether a school district has offered a FAPE. *Rowley*, 458 U.S. at 206–07. First, the district must have complied with the *procedures* set forth in the IDEA. *Id.* Second, the IEP developed through those

procedures must meet a *substantive* standard: it must be "reasonably calculated to enable [the] child to make progress appropriate in light of the child's circumstances." *Endrew F. v. Douglas Cty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2007). If the district satisfies both prongs, it has complied with the IDEA's requirements. *Rowley*, 458 U.S. at 207.

Even when a district has committed a procedural violation in its provision of a FAPE, however, a court assessing a complaint about such a violation must base its decision "on substantive grounds based on a determination of whether the child received a free appropriate public education." 20 U.S.C. § 1415(f)(3)(E)(i). A procedural violation rises to the level of a substantive deprivation of a FAPE only if the violation (1) impeded the child's right to a FAPE; (2) significantly impeded the parent's opportunity to participate in the decision-making process; or (3) caused a deprivation of educational benefits. *Id.* § 1415(f)(3)(E)(ii).

In addition to establishing the procedural and substantive requirements for the provision of a FAPE, the IDEA also requires that state and local educational agencies "shall establish and maintain procedures . . . to ensure that children with disabilities and their parents are guaranteed procedural safeguards with respect to the provision of a [FAPE] by such agencies." 20 U.S.C. § 1415(a). Parents of handicapped children must be notified of proposed changes to their child's educational placement or in the provision of their child's FAPE. *Id.* § 1415(b)(3) Parents must also be permitted to bring a complaint about "any matter relating to" the evaluation and educational placement of their child. *Id.* § 1415(b)(6)(A).

When such a complaint is received, "the parents or the local educational agency involved in such complaint" must be afforded an opportunity for an impartial due process hearing conducted by the state or local educational agency. *Id.* § 1415(f). Assuming that that hearing is held before a local educational agency, a party aggrieved by the resulting decision may appeal to

the state educational agency.  *Id.* § 1415(g).  Thereafter, "[a]ny party aggrieved by the findings and decision" of the state hearing has "the right to bring a civil action with respect to the complaint . . . in a district court of the United States, without regard to the amount in controversy."  *Id.* § 1415(i)(2)(A).

**B. Factual Background.**

Steven is an autistic child born in 2004.  ECF No. 2 at 7.  Before Steven was placed at Alpine in June 2013, he had attended a variety of schools in the District where he had not demonstrated any progress in academics or behavior.  *Id.* at 4.  In contrast, while at Alpine Steven's behaviors improved, and he began making academic progress for the first time.  *Id.*; R. 30.  Alpine is a non-profit "licensed day-treatment and day-habilitation center providing research based educational and behavioral services and supports" to individuals with autism.  ECF No. 2 at 4.

In April 2014, after Steven's first year at Alpine, the District attempted to change his placement to the School of Excellence ("SOE").  *Id.*  Steven's mother and several other parents of children subject to the District's 2014 decision filed a complaint with the Colorado Department of Education asserting that this decision violated the IDEA.  R. 105–35.  The State Complaints Officer who reviewed this complaint reversed the District's decision to change the students' placement, finding that the District had violated the IDEA in its decision-making process.  R. 131–32.  The first state complaint decision ordered that Steven's placement remain at Alpine, required the District to submit a proposed corrective action plan to the Department of Education to address its violations, and prohibited any changes to Steven's or the other students' placements until after the corrective action had been taken.[1]  R. 134.

---

[1] The Colorado Department of Education approved the District's corrective action plan.  R. 11–12.

The first state complaint decision also contained several placement procedures designed to prevent future violations by the District. In particular, the District was prohibited from changing Steven's placement until (1) it conducted a comprehensive evaluation of Steven; (2) staff members from any proposed new placement observed Steven at Alpine to understand his educational and behavioral functioning; and (3) the District convened an IEP meeting facilitated by a neutral facilitator "not employed by the School District" that complied with all the procedural requirements of the IDEA, particularly those that the District had violated. *Id.*

In 2015, the year after the first state complaint decision was issued, Steven's IEP was again reviewed, and his placement at Alpine remained unchanged. However, when Steven's IEP was reviewed again the following year in a meeting begun on March 29, 2016 and concluded on April 5, 2016, the District decided—based on a majority vote—to change his placement from Alpine to SOE. R. 451–54. The IEP meeting was facilitated by Amy McFall (nee Spayd), a District-employed psychologist. R. 219. No one from SOE was present at the meeting, nor had any SOE staff or teacher observed Steven at Alpine prior to the District's decision to change Steven's placement. R. 28 at 10.

The final summary of the IEP meeting reflects that the team determined that Steven required a separate school, meaning one which exclusively serves handicapped children, which is the most restrictive category of placement options. R. 452. In deciding on a separate school rather than a placement where Steven would spend less than 40% of his time in general education the team "decided that Steven required more individualized instruction and 1:1 adult supervision and instruction." R. 453. The team considered three placement options before deciding on SOE: Alpine, the Roundup School, and SOE. R. 452.

SOE is a separate public school located in the District's catchment area. R. 30, 222. However, SOE is operated by the Pikes Peak Board of Cooperative Educational Services rather than by the District, so it is considered an out-of-district school. R. 222. It is comprised of at least four programs, two of which are appropriate for autistic students: the Communication and Learning Program ("COLA") and Learning Independence by Educating Responsible Trustworthy Youth ("LIBERTY"). R. 29, 222, 634. Although the District concluded that Steven's placement would be changed to SOE, it did not specify which of the SOE programs Steven would attend. R. 453. The record reflects that at the end of the IEP meeting, no one present knew whether Steven was being placed at COLA or at LIBERTY, Steven's mother included. R. 901, 942, 995, 1042, 1080, 1343, 1351–52. Steven's mother was upset at the outcome of the meeting, as she did not feel that Steven would be well-served at SOE. R. 31.

The day after the IEP meeting, then-District Coordinator of Special Programs Amy Lloyd[2] reached out to the Assistant Principal at SOE to ask whether SOE had room for Steven. R. 331. Ms. Lloyd indicated that Steven would "need to be in either the COLA or Liberty [sic] programs." *Id.* The Assistant Principal indicated that she would "like to review the IEP to determine possible placement," R. 337, and the two discussed scheduling a meeting and a tour of SOE for Steven's mother. R. 336.

In the meantime, Steven's mother filed her second state complaint with the Colorado Department of Education on May 5, 2016, alleging that the 2016 IEP decision violated the IDEA and the first state complaint decision. R. 25. She noted that the IEP meeting had been conducted by a District employee in direct violation of the first state complaint decision's requirement that any IEP meeting be facilitated by a neutral facilitator "not employed by the District," and that no

---

[2] Since September of 2016 Ms. Lloyd has held the position of Director of Special Programs at the District. R. 595–96.

representative from any proposed future placement had observed Steven at Alpine prior to the District's decision to change his placement. R. 25; *see also* R. 134. She also alleged that the District had failed to make a specific offer of placement, failed to base its decision on Steven's individual needs, and predetermined its decision to change Steven's placement. *Id.*

On May 16, 2016 Ms. Lloyd reached out to Steven's mother to schedule a meeting with SOE "to discuss a transition for Steven," R. 92, but Steven's mother's attorney declined the invitation on the basis of the pending state complaint. R. 91. On June 30, 2016 the State Complaints Officer issued her decision on Ms. Fernandez's second complaint, finding that the District had again violated the IDEA in the 2016 IEP meeting. R. 35. The second state complaint decision found that the District had violated the express terms of the first state complaint decision, that its decision to change Steven's placement was not based on his individual needs and was predetermined, and that the District had failed to make a sufficiently specific offer of placement to put Steven's mother on notice of what was being proposed. R. 35–37.

Following the second state complaint decision, the District filed a due process complaint with the Colorado Department of Education. R. 2. The District alleged that the State Complaints Officer had selectively interviewed Steven's mother and Alpine staff without interviewing District staff members on the IEP team. R. 4. Moreover, the District argued that the complaint process had not afforded the District the opportunity to engage with the process, including by cross-examining witnesses. *Id.* Moreover, the District alleged several errors on the part of the State Complaints Officer in reaching her decision. R. 4–9. The District requested that the Administrative Law Judge ("ALJ") Robert Spencer find that the District had made a timely offer of FAPE. R. 225. The ALJ decided in the District's favor that it had made a timely offer

of FAPE, and that any procedural violation did not deprive Steven of FAPE or an educational benefit or deprive his mother of her right to participate in the decision. R. 233.

In response to the ALJ's decision, Steven and his mother filed the present complaint before this Court seeking a de novo review of the administrative record and asking that the Court find that the 2016 IEP denied Steven the FAPE to which he is entitled. ECF No. 2 at 15. Moreover, Steven requests that the Court award his mother reimbursement for the educational services she provided him at Alpine during the 2016-17 school year. *Id.* Finally, he seeks a declaration that the District violated his rights under Section 504 of the Rehabilitation Act. *Id.* The parties have fully briefed the issues before the Court. ECF Nos. 28–30.

## II. STANDARD OF REVIEW

"'[J]udicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts generally are confined to the administrative record and are held to a highly deferential standard of reviews.'" *Murray v. Montrose Cnty. Sch. Dist. RE-1J*, 51 F.3d 921, 927 (10th Cir. 1995) (internal citation omitted). "A district court applies a modified *de novo* standard in reviewing a hearing officer's decision under the IDEA." *L.B. ex rel. K.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 973 (10th Cir. 2004). Pursuant to this standard, the Court "looks at the record of the administrative proceedings and decides, based on a preponderance of the evidence, whether the requirements of the IDEA are met." *Id.* at 973–74. In conducting this review the Court must give "due weight" to the hearing officer's findings of fact, "which are considered *prima facie* correct." *Id.* "The district court's proceedings must maintain the character of review and not rise to the level of a *de novo* trial." *Id.*

# III. ANALYSIS

Steven and his mother argue that the District's decision to assign Steven to SOE violated the IDEA for various procedural reasons and also violated Steven's rights under Section 504 of the Rehabilitation Act of 1973[3]. ECF No. 28 at 2. For the reasons stated herein, I agree that the District's procedural errors violated Steven's mother's right to participate meaningfully in the District's decision about where to place her son.

## A. **IDEA Claim**.

Steven and his mother claim that the District committed various procedural violations that impeded Steven's right to a FAPE, impeded his mother's opportunity to participate in the decision, and caused him a deprivation of educational benefits. In the IDEA, "Congress placed every bit as much emphasis upon compliance with procedures giving parents and guardians a large measure of participation at every stage of the administrative process . . . as it did upon the measurement of the resulting IEP against a substantive standard." *Rowley*, 458 U.S. at 205–06. However, "[a]n IEP's failure to clear all of the Act's procedural hurdles does not necessarily entitle a student to relief for past failures by the school district." *Sytsema ex rel. Sytsema v. Academy Sch. Dist. No. 20*, 538 F.3d 1306, 1313 (10th Cir. 2008) (citing *Garcia v. Bd. of Educ. of Albuquerque Pub. Schs.*, 520 F.3d 1116, 1125–26 (10th Cir. 2008)). Instead, a procedural failure will only entitle a student to relief if that failure results in an effective denial of a FAPE. *Id.* A procedural failure amounts to the denial of a FAPE when it results in "'substantive harm to the child or his parents'; 'deprive[d] an eligible student of an individualized education program';

---

[3] Steven also alleges that the District violated the Colorado Exceptional Children's Act, C.R.S. § 22-20,101, *et seq.*, but this allegation was made only in passing in his opening brief. *See* ECF No. 28 at 2. Because Steven does not address the terms of this statute or substantiate the alleged violation, I will deem any additional argument thereunder to be waived.

or 'result[ed] in the loss of [an] educational opportunity.'" *Id.* (quoting *Knable ex rel. Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 765 (6th Cir. 2011)) (alterations in original). As the *Knable* court explained, "[s]ubstantive harm occurs when the procedural violations in question seriously infringe upon the parents' opportunity to participate in the IEP process." 238 F.3d at 765.

Steven contends that the District made three procedural errors that amount to a denial of FAPE: (1) failing to include a specific offer of educational placement in his IEP; (2) failing to comply with the placement procedures ordered after the first state complaint; and (3) predetermining the decision to change Steven's placement from Alpine before the IEP meeting. ECF No. 28 at 13.

### 1. Failure to Include a Specific Offer of Educational Placement in Steven's IEP.

As noted, at the conclusion of the IEP meeting the District decided that Steven would be placed at SOE, but it did not decide whether Steven would attend the COLA or the LIBERTY program. R. 223, 453. SOE is comprised of four programs for students on IEPs, one of which also supports students who are not on IEPs. R. 634. COLA and LIBERTY are the two SOE programs designed to support students with autism. Although the District refers to COLA and LIBERTY as "classrooms" located in SOE, the record reflects that they are in fact distinct programs within SOE for autistic students with different abilities and needs. ECF No. 29 at 10. Amber Brown, a Board-Certified Behavior Analyst at SOE, testified that "the COLA program is for students who have a diagnosis of autism" with "very limited to no functional communication." R. 1092. In contrast, "the LIBERTY program is for students who have a dual diagnosis and/or autism. . . . Those students have more functional language." R. 1094. Ms. Lloyd also described her understanding of the differences between the two programs:

> COLA is more restrictive. They have a more intense one-on-one support, and
> they focus primarily on those behaviors relating to autism. And the LIBERTY

program is less restrictive in—where it takes a more—three-students-to-one adult setting, and they shift the focus more into the academics as the behaviors have become more under control.

R. 635. Finally, occupational therapist Nancy Morin described the differences between the "two programs" at SOE, noting that "the COLA program tends to be a little more restrictive, a little more lower [sic] teacher/student ratio." R. 457. In contrast, "LIBERTY is a little less restrictive. It's more focused on autism, more emphasis on academics." R. 458. She confirmed that "COLA and LIBERTY are two separate educational placements within the physical building of School of Excellence." *Id.*

Steven argues that the District failed to make a specific offer of an educational placement because the IEP meeting resulted only in the conclusion that he would be placed at SOE, which is merely the building that houses various educational programs. ECF No. 28 at 14. Steven argues that the District's failure to determine his specific educational placement violated regulations requiring that his parent be in the group that makes the placement decision and be afforded the opportunity to participate in meetings concerning her child's educational placement. *See* 34 C.F.R. §§ 300.116(a)(1), 300.501. Steven argues that because the District's procedural failure to identify his placement impeded his right to a FAPE and significantly impeded his mother's opportunity to participate in the decision-making process about her son's educational placement, he is entitled to relief. ECF No. 28 at 19.

The ALJ who decided the due process complaint disagreed. The ALJ concluded that "[t]he lack of a final decision whether [Steven] would enter the COLA or LIBERTY classroom at the SOE is not a procedural violation." R. 231. Instead, according to the ALJ, the decision between the two programs was merely one of "educational methodology within the sole discretion of the School District and the SOE." *Id.* The ALJ emphasized that so long as a

student receives the education services specified in his IEP, the question of educational methodology is left to the teachers. *Id.* at 231–32.

The District urges the Court to adopt the ALJ's reasoning. The District argues that it need not have chosen between COLA and LIBERTY to have made a final offer of educational placement. ECF No. 29 at 22. The District emphasizes that in either program the teachers would provide the services called for in Steven's IEP. *Id.* According to the District, so long as the teachers provide those services, the focus of those services (i.e., behavioral or academic) is within the teachers' discretion and does not amount to a change of placement. In the alternative, the District contends that even if COLA and LIBERTY were different placements, the decision not to choose between them was not an error. R. 23. It contends that since either program would be appropriate, there was no requirement to identify which would be "ideal." *Id.* Relatedly, the District contends that it should not be penalized for Steven's mother's decision not to be engaged in the ultimate decision between COLA and LIBERTY, since the District extended the invitation to participate but she refused. *Id.* at 24.

I agree with Steven and his mother that the District's deciding on SOE does not constitute an offer of an educational placement, so Steven's mother was denied the opportunity to participate in the decision on her son's placement. As such, the District violated the regulations pursuant to the IDEA, and this error entitles Steven and his mother to relief.

The decision about a child's placement must be "made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options." 34 C.F.R. § 300.116(a)(1); *see also* 20 U.S.C. 1414(e) ("each public agency must ensure the parents of each child with a disability are members of any group that makes decisions on the educational placement of their child."), 34 C.F.R. § 300.327, *id.* §

300.501(b)(1)(i).  Additionally, as noted, a child's IEP is required to include the anticipated location where the child will be educated.  20 U.S.C. § 1414(d)(1)(A)(i)(VII).  However, the IDEA does not explicitly require the participation of parents in site selection.  *White ex rel. White v. Ascension Parish Sch. Bd.* 343 F.3d 373, 379 (5th Cir. 2003).

The term "educational placement" is not defined in the IDEA or in the federal regulations on the subject.  However, courts have found that "educational placement" means "educational program," rather than "the particular institution where that program is implemented."  *Id.* Similarly, the Second Circuit construed educational placement to mean "the classes, individualized attention and additional services a child will receive—rather than the 'bricks and mortar' of the specific school."  *T.Y. v. N.Y.C. Dep't of Educ.*, 584 F.3d 412, 419 (2d Cir. 2009).

Most cases that determine what constitutes an educational placement do so in the context of determining whether a change in placement has occurred when a child changes schools or when his educational services are changed.  In this case, in contrast, the District was concededly changing Steven's educational placement when it decided to move him from Alpine to SOE.  *See* R. 582 (in the hearing with the ALJ, the District's attorney conceded that the move from Alpine to SOE was "a change in placement").  The question, then, is not whether SOE and Alpine constitute distinct placements, but instead whether the education programs offered by COLA and LIBERTY constitute two distinct placements.  Nevertheless, despite the differences in the underlying facts, the analyses conducted in cases determining whether a change in placement has occurred in the first instance are helpful in answering the question before the court since they flesh out what makes one placement distinct from another.

Courts determining whether a change of placement has occurred assess whether a proposed change affects the "child's general program of education."  *Christopher P. v. Marcus*,

915 F.2d 794, 796 n.1 (2d Cir. 1990), *cert. denied*, 498 U.S. 1123 (1991). Thus, even when a child changes schools, a change in educational placement has occurred only if there has been "a fundamental change in, or elimination of a basic element of the education program." *Lunceford v. District of Columbia Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C. Cir. 1984). After assessing the key differences between a disabled child's new and old schools, the *Lunceford* court found that the fact that the staff at the child's new location would not be able to "administer its feeding program as well" as the staff at his previous location did render the move a change in educational placement. *Id.* at 1583. The student would still be fed on a one-to-one basis and according to a program developed by a nutritionist, just as he was at his previous program. *Id.* Similarly in *Weil v. Board of Elementary & Secondary Education*, 931 F.2d 1069, 1072 (5th Cir. 1991), a transfer between schools did not constitute a change in educational placement because both schools were under the supervision of the same School Board, "both provided substantially similar classes, and both implemented the same IEP" for the student. *Id.*

The "basic element" standard is also used in the Tenth Circuit. *See Erickson v. Albuquerque Pub. Schs.*, 199 F.3d 1116, 1122 (10th Cir. 1999) ("An educational placement is changed when a fundamental change in, or elimination of, a basic element of the educational program has occurred."). Thus, the elimination of one form of occupational therapy did not change a child's educational placement in *Erickson* when that child remained at the same school and continued to receive other forms of the therapy to which he was entitled under his IEP. *Id.*

These findings are reinforced by the following rule adopted by the Colorado Department of Education defining the term "educational placement":

> The terms 'placement' or 'educational placement' are used interchangeably and mean the provision of special education and related services and do not mean a specific place, such as a specific classroom or specific school. Decisions regarding the location in which a child's IEP will be implemented and the

assignment of special education staff responsibilities shall be made by the
Director of Special Education or designee.

1 CCR 301-8, Rule 4.03(8)(a). The rule also differentiates between a nonsignificant change in program or service, which would be something like "a change in the amount of a given service," and a significant change in placement, which includes "placement or referral to a private school or approved facility school" and "the addition or termination of an instructional or related service." *Id.* at 4.03(8)(b)(i)–(ii). A significant change in placement would also be "any change which would result in" a child's having "different opportunities to participate in nonacademic and extracurricular activities." *Id.* at 4.03(8)(b)(ii)(A)(I). Finally, the rule indicates that a change in building or location does not necessarily constitute a change in placement. *Id.* at 4.03(8)(b)(iii).

Applying the "essential element" test to the COLA and LIBERTY programs, I find that these are distinct educational placements. They serve different populations of autistic students, employ different student to teacher ratios, and have different focuses. Even if Steven's IEP could be implemented in either program, there are sufficient essential differences between the two programs to make them distinct placements. For one thing, the difference in the student to teacher ratio is an essential element in Steven's education program, as highlighted by his IEP. The members of the IEP team acknowledged that Steven requires 1:1 attention from a teacher or staff member. R. 453; *see also* R. 443. As Amber Brown, the Board-Certified Behavior Analyst at SOE noted, LIBERTY would not provide that type of attention, and COLA would be more appropriate given its smaller staff-to-student ratio. R. 349. Moreover, as the IEP team members acknowledged, COLA and LIBERTY are designed to serve different populations: COLA serves those autistic individuals with more behavioral issues who are less capable of working on teams and have less functional communication skills. *Id.* In contrast, LIBERTY serves students with

greater communication skills and the ability to engage more in academic work. Additionally, the programs differ in their focus on academics versus behavior, a fact Ms. Brown acknowledged when she found that Steven should start at COLA until his behavior was improved enough for him to move to LIBERTY. *Id.* These differences reflect essential differences in the programs' purposes and aims, and as such indicate that they are distinct educational placements.

I am not convinced by any of the District's arguments to the contrary. First, the District argues that an "educational placement" is merely the "program of services described *in* the child's 'individualized educational *program.*'" ECF No. 29 at 22 (emphases in original). Thus, according to the District, though COLA and LIBERTY "may have used different groupings or interventions to implement Steven's IEP, they were not different educational placements." *Id.* . If educational placement were synonymous with the provision of the IEP's services, then deciding on an institution or school to provide these services would be superfluous: the description of the services to be provided pursuant to the IEP would suffice to establish a child's educational placement. And yet that is plainly not the case. The culmination of the IEP meeting is a decision on when and where they child will receive the services described therein. 20 U.S.C. § 1414(d)(1)(A)(i)(VII). According to the Colorado Rule referenced above, the determination of placement is "*based on* the child's IEP." 1 CCR 301-8, Rule 4.03(8)(a) (emphasis added). When one institution's "classes, individualized attention and additional services a child will receive" are different from what the child will receive at a different institution or program, they are distinct placements, and the District must choose between them. *T.Y.*, 584 F.3d at 419.

The process conducted at the IEP meeting and thereafter belies the District's contention that a placement is merely the program outlined in the IEP. After the group agreed about Steven's current status, his goals and objectives, and the particular interventions or services

needed to reach those goals, the group then discussed three potential educational placements for Steven: Alpine, SOE, and the Roundup school. Moreover, the day after the meeting, the District reached out to SOE to begin determining whether Steven should attend COLA or LIBERTY. R. 331. If an "educational placement" meant only the provision of the services dictated in the IEP, then the group would have been done with its task before it ever contemplated which of the three schools Steven would attend, and the District's attempting to choose between COLA and LIBERTY would have been superfluous. Moreover, under this rationale, Alpine, SOE, and Roundup would each be considered the same placement since they would be expected to provide the same IEP services. Thus, the fact that the group did not stop at determining the services Steven would need according to his IEP, but instead went on to consider which schools could provide the services, indicates that the District understands that an educational placement in fact involves the institution, school or program where a child's IEP will be provided.

The District also argues that Steven's differentiating between COLA and LIBERTY is tantamount to calling a teacher's discretionary decision to change the way she uses her time a change in placements. *See* ECF No. 29 at 23. Not so. The differences between COLA and LIBERTY are well understood and are institutional rather than based on teachers' discretion. The record indicates that these programs catered to different audiences and offered distinct services, teacher-to-student ratios, focuses, and supports. ECF No. 28 at 21. Moreover, the fact that the District explained its decision to transfer Steven from Alpine to SOE on the basis of the latter school's more academic focus belies its argument. Similarly, the District's own actions after the IEP meeting to decide which program Steven should be placed in indicate that the District understands the legitimate differences between the programs that go beyond any

teacher's discretion.  Thus, the District's attempt to minimize these differences is disingenuous and contradicts its own actions.

Indeed, despite the District's argument that placement does not involve a physical location, the District's contention that SOE is an educational placement and the COLA and LIBERTY programs are merely classrooms therein seems to rest largely on the fact that COLA and LIBERTY are in the same physical building.  Given these substantial differences, it is difficult to understand why the District would consider the programs to be the same educational placement aside from the fact that they are both housed in the same SOE building.  This is not a valid ground for determining educational placement.

Furthermore, I am not persuaded by the District's alternative argument that even if the two programs were different placements, there is no need to choose which is ideal, since either one could provide the services specified in the IEP.  ECF No. 29 at 23.  The District's argument would indicate that so long as all the placement options being considered are reasonable and can provide the services needed in the child's IEP, the parents need not be involved in any decision about the placement.  This argument plainly contradicts the requirement that parents be involved in the decision about where their child is placed.  *Rowley*, 458 U.S. at 181–82; *see also* 20 U.S.C. § 1414(e).  If the District concedes that the two programs were different placements, then there is no excuse for its failing to decide at the IEP meeting which of the programs Steven would be placed in, thereby including Steven's mother in that decision.  Its failure to do so precluded Steven's mother from participating in that decision as she had a right to do.

The District also contends that it intended to schedule a follow-up meeting during which the parties would decide whether COLA or LIBERTY was the more appropriate program for Steven, but that Steven and his mother "chose not to participate."  ECF No. 29 at 23.  If the

District had such intentions to clarify its placement decision at a later date, such an intention was not made clear at the meeting either orally or in the written summary of the meeting. A recording of the meeting indicates only that there was a brief mention of a potential meeting at a later date to discuss Steven's transition. Exhibit L. While some members of the IEP meeting testified that they understood at the conclusion of the meeting that there would be a follow-up meeting to discuss which program Steven would be in, Steven's mother did not have that understanding. *See* R. 1042, 1059; *see also* ECF No. 30 at 5. Moreover, even if there were such an understanding conveyed orally, the relevant consideration is limited to the final decision as communicated in the written IEP, which, as noted, indicated only that Steven would be placed at SOE, which is not a specific offer of placement. *See Sytsema*, 538 F.3d at 1309 (when assessing the sufficiency of an IEP, a district court is to "restrict its review to the draft IEP as written without considering any oral discussions that occurred between the respective parties"); *see also id.* at 1315 ("The IDEA specifically defines an IEP as a written document.").

I am not impressed by the District's blaming Steven's mother for not being included in the ultimate decision between the COLA and LIBERTY programs. *See* ECF No. 29 at 24 (arguing that Mother "cannot complain that she was denied the opportunity to participate when the opportunity was extended but she chose not to participate."). The District cites *Sytsema*, 538 F.3d at 1315, in which the parents "unilaterally terminated the IEP development process due to their concerns about the District's plan to place [their child] in an integrated classroom." However, in *Sytsema*, the court noted that "the District had not yet finalized its offer for educational services" when the parents unilaterally terminated the proceedings. *Id.* In this case, in contrast, the District's final offer at the end of the IEP meeting was SOE, and it made no indication to Steven's mother that there would be a further decision about which program he

would attend.  The email inviting Steven's mother to discuss Steven's transition to SOE was sent a month after the final decision.  R. 92.  Steven's mother was well within her right to file a complaint within that time objecting to the procedural violations at the IEP meeting.  The burden was on the District to comply with its procedural requirements in the IEP meeting, not on Steven's mother to wait and see whether the District would correct its errors at a later date.

I conclude that SOE was not a valid final educational placement, but that instead the COLA and LIBERTY programs were distinct placements within SOE.  As such, the District's decision to transfer Steven to SOE without identifying which program he would attend failed to provide his mother with sufficiently specific information about where her son was being placed and prevented her from participating in the ultimate placement decision.  This is especially problematic in light of the District's failure to comply with the placement procedures ordered by the Colorado Department of Education's first state complaint decision, discussed below.  The failure to decide on Steven's educational placement "seriously infringe[d] upon [his mother's] opportunity to participate in the IEP process."  *Knable*, 238 F.3d at 76.  As a result, this procedural failure amounted to the denial of a FAPE and requires reversal of the ALJ's decision.

2. Failure to Comply with Placement Procedures.

Steven makes two additional procedural arguments: (1) that the District failed to comply with the placement procedures developed after his mother's first state complaint, and (2) that the District predetermined to change his placement before it commenced the IEP meeting.  Although I need not reach these further arguments given my finding that Steven's mother was denied the opportunity to participate in the decision on Steven's placement, I will address the District's failure to comply with the placement procedures enacted in the first state complaint decision.  I am troubled by the failure and the District's defense of this failure before the ALJ and this Court,

both of which indicate a lack of regard for the state complaint procedure. The District's failure to comply with these procedures compounded Steven's mother's difficulty in participating in the decision about her son's educational placement.

The placement procedures ordered by the State Complaints Officer, to which the District did not object at the time, dictate as follows:

> [T]he School District shall be prohibited from changing the Students' placement until:
>
> a. The School District conducts comprehensive evaluations of the Students, in accordance with the requirements of IDEA;
>
> b. Staff members from any new placement proposed by the School District, which staff would have responsibility for providing special education and related services to the Students, have observed the Students in their at [sic] Private Autism Center to understand the nature of Students' educational and behavioral functioning.
>
> c. The School District convenes an IEP meeting, facilitated by a neutral facilitator (not employed by the School District), for each Student that complies with all procedural requirements of IDEA, particularly all of the provisions that the SCO has found the School District to have violated, and develops an IEP that includes a description of placement sufficient to allow the Parents to understand what is being proposed.

R. 393.

In his decision after the due process hearing, the ALJ noted that "[t]here is no dispute that, contrary to the SCO's order, the School District failed to employ an IEP meeting facilitator who was not employed by the School District." R. 232. However, the ALJ was not bothered by this violation since it "did not amount to a denial of FAPE." *Id.* The District urges that Ms. McFall, the District psychologist who led the meeting, behaved neutrally and did not participate in the vote. ECF No. 29 at 30–31. Be that as it may, the placement procedure expressly required that the individual be neutral by virtue of the fact that she not be employed by the District, not by virtue of her neutral behavior. This requirement was put in place for a reason: to give Steven's mother a fair hearing led by an individual without an interest in the outcome. Despite Ms.

McFall's apparently disciplined and neutral behavior at the meeting, the mere fact of her employment by the District may have exerted a pressure or bias on the proceedings and given Steven's mother the sense that the proceedings were not fair.

The ALJ also noted that the District failed to have a staff member from a proposed placement observe Steven before changing his placement. *Id.* According to the ALJ, this second error is less clearly a violation of the placement procedures, since there is some ambiguity in the procedures as to whether such observation must occur before the placement decision is made or before the change in placement occurs. *Id.* I disagree that there is any ambiguity. The plain language of these procedures indicates that at the stage when a new placement is "proposed," i.e., not yet chosen, staff members from that proposed placement must observe Steven. *See* R. 393. As a result, the District's failure to have a staff member from SOE observe Steven prior to the decision to place Steven at SOE violated the plain language of this procedure.

Moreover, as discussed above, the District's failure to specify which program Steven would be attending at SOE violated the third placement procedure, which prohibited the District from changing a placement until the District "develops an IEP that includes a description of placement sufficient to allow the Parents to understand what is being proposed." *Id.* Since COLA and LIBERTY were distinct placements, the outcome of the IEP meeting did not clearly describe Steven's placement for his mother's benefit.

These violations of the placement procedures resulted in a failure to provide Steven's mother with the process she was guaranteed by the Colorado Department of Education through its State Complaints Officer, and are further evidence of the District's failure to ensure Steven's mother had the opportunity to participate fully in the decision on Steven's placement. Unlike the ALJ, I cannot condone these violations of the state placement procedures. Although the

particular requirements ordered by the State Complaints Officer may not be enshrined in state or federal regulations, *id.* at 232, I find that the IDEA's requirement that states establish such state complaint proceedings requires that the remedies devised therein be respected and enforced.[4]

The state complaint process that is mandated by the IDEA would become a sham proceeding if the remedies devised pursuant to that process were not enforceable. To ignore these requirements would discourage parents and school districts from pursuing such remedies in the first place. Such an outcome would pervert the intention in the IDEA that states create such systems to provide a remedy for parents before they seek relief in federal court. *See* 34 C.F.R. §§ 300.151– 300.153 (establishing the requirement for state complaint procedures, including that each state education agency must adopt written procedures for "[r]esolving any complaint"). Of particular relevance are the federal regulations providing that:

> (b) Remedies for denial of appropriate services. In resolving a complaint in which the [State educational agency ("SEA")] has found a failure to provide appropriate services, an SEA, pursuant to its general supervisory authority under Part B of the Act, must address—
>> (1) The failure to provide appropriate services, including corrective action appropriate to address the needs of the child (such as compensatory services or monetary reimbursement); and
>> (2) Appropriate future provision of services for all children with disabilities.

34 C.F.R. § 300.151. These federal regulations pursuant to IDEA indicate that state complaint remedies are a required component of the state complaint procedures. Thus, it would be nonsensical to fail to enforce the remedies mandated by the State Complaints Officer in this case.

Moreover, the placement procedures devised in Steven's case were designed to ensure that his mother in particular—as opposed to parents in a general sense—would have meaningful

---

[4] It is no excuse that the District's employees at the time of the 2016-17 IEP meeting were not personally aware of the placement procedures. The District must ensure that procedures mandated by the State Complaints Officers be complied with despite predictable and inevitable changes in District personnel.

participation in a fair IEP meeting with a clear outcome. The violation of these procedures set out for Steven's and his mother's benefit is arguably more egregious than the violation of a non-particularized procedure set out in regulation or statute that applies equally to all children and all parents. As such, the ALJ's decision not to enforce these procedures on the grounds that they are not found in regulation or statute ignores the fact that they were developed in a state complaint proceeding created pursuant to federal regulations to provide more individualized protections in just such a situation.

Therefore, the District's ignoring the placement procedures designed to protect Steven's mother's right to a fair IEP process, in conjunction with its failing to provide a clear offer of educational placement, infringed Steven's mother right to meaningful participation in the IEP process. As a result, these failures amount to the denial of a FAPE. *See Knable*, 238 F.3d at 76.

**B. Violation of Section 504 of the Rehabilitation Act.**

In addition to asserting violations of the IDEA, Steven also claims that the District violated his rights under Section 504 of the Rehabilitation Act and the regulations thereunder by intentionally discriminating against him. The Rehabilitation Act is a "broad anti-discrimination statute." *Kimble v. Douglas Cnty. Sch. Dist. RE-1*, 925 F. Supp. 2d 1176, 1181 (D. Colo. 2013) (internal quotation marks and citation omitted). It prohibits the exclusion or discrimination of individuals with disabilities from participation in programs that receive federal funds. 29 U.S.C. § 794(a). The regulations promulgated under the Rehabilitation Act require that school districts ensure that disabled students receive a FAPE, although FAPE in the context of the Rehabilitation Act is similar but not identical to FAPE in the context of the IDEA. *Kimble*, 925 F. Supp. 2d at 118; *Mark H. v. Lemahieu*, 513 F.3d 922, 933 (2008).

"A prima facie case under § 504 consists of proof that (1) plaintiff is handicapped under the Act; (2) he is 'otherwise qualified' to participate in the program; (3) the program receives federal financial assistance; and (4) the program discriminates against plaintiff." *Hollonbeck v. U.S. Olympic Comm.*, 513 F.3d 1191, 1194 (10th Cir. 2008) (internal citation omitted). To prevail on a Section 504 claim, plaintiffs must prove intentional discrimination, but "that standard may be met by showing 'deliberate indifference,' and not only by showing 'discriminatory animus.'" *Lemahieu*, 513 F.3d at 938 (quoting *Duvall v. Cnty. of Kitsap*, 260 F.3d 1124, 1135–36 (9th Cir. 2001)). "The test for deliberate indifference in the context of intentional discrimination comprises two prongs: (1) 'knowledge that a harm to a federally protected right is substantially likely,' and (2) 'a failure to act upon that . . . likelihood.'" *Barber ex rel. Barber v. Colo. Dep't of Revenue*, 562 F.3d 1222, 1229 (10th Cir. 2009) (quoting *Duvall*, 260 F.3d at 1139). To satisfy the "failure to act" prong of the deliberate indifference test, the failure to act must be the "'result of conduct that is more than negligent, and involves an element of deliberateness.'" *Id.* (quoting *Lovell v. Chandler*, 303 F.3d 1029, 1056 (9th Cir. 2002)).

Steven contends that he easily meets the first three requirements to make a prima facie case under Section 504, and that with respect to the fourth prong, the District discriminated against him when it failed to comply with the placement procedures ordered in the first state complaint decision. ECF No. 28 at 38. Steven contends that the District was deliberately indifferent to the likelihood that its failing to follow the placement procedures would result in denying Steven a FAPE. *Id.* at 42, 45 (quoting *Powers v. MJB Acquisition Corp.*, 184 F.3d 1147, 1153 (10th Cir. 1999)).

I am not persuaded that the District discriminated against Steven by means of deliberate indifference. Though I reiterate that the District's IEP team members ought to have been aware

of the placement procedures, they have testified that they were not personally aware of them at the time of the IEP meeting. *See* R. 655, 1077. I agree with Steven that the District fell short of its responsibility to comply with the procedures, but I do not agree that the failure to do so indicates deliberate indifference. Instead, this seems to be a case of a negligent failure to stay apprised of and apply the required placement procedures.

Because I do not find that the District was deliberately indifferent when it failed to take into account the placement procedures, Steven has not established discrimination against him under Section 504 of the Rehabilitation Act.

## ORDER

The ALJ's decision upholding the District's IEP placement is reversed. The District's failure both to identify an educational placement in the IEP and to comport with the placement procedures in conducting the IEP meeting precluded Steven's mother from participating meaningfully in Steven's placement. These failures amount to the denial of a FAPE, so the ALJ's decision affirming the IEP and finding that the District provided a FAPE is reversed. The The District is ordered to reimburse Steven's mother the cost of the appropriate educational services she provided to Steven at Alpine during the 2016-17 school year. *See* 20 U.S.C. § 1412(a)(10)(C)(ii). Additionally, the Court awards Steven's mother her reasonable attorney's fees associated with this action pursuant to 20 U.S.C. § 1415(i)(3)(B)(i).

DATED this 26th day of July, 2018.

BY THE COURT:

_____

R. Brooke Jackson
United States District Judge